**2015-1266, -1708, -1709, -1753**

IN THE

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

_____

## DIGITAL REG OF TEXAS, LLC,

*Plaintiff-Appellant,*

v.

## ADOBE SYSTEMS INCORPORATED,

*Defendant-Cross-Appellant.*

_____

**Appeal from the United States District Court for the
Northern District of California in Case No. 12-cv-01971,
Judge Claudia Wilken**

_____

**PRINCIPAL BRIEF OF ADOBE SYSTEMS, INC.**

_____

Edward R. Reines
  *Principal Attorney*
Byron Beebe
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
(650) 802-3000

*Counsel for Defendant-Cross-Appellant
Adobe Systems, Inc.*

September 25, 2015

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Defendant-Cross-Appellant certifies the following:

1.      **The full name of every party or amicus represented by me is:**

ADOBE SYSTEMS, INC.

2.      **The name of the real party in interest (if the party named in the caption is not the real party in interested) represented by me is:**

N/A

3.      **All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:**

None

4.      **The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or are expected to appear in this court are:**

| | |
|---|---|
| Edward R. Reines | Jennifer H. Doan |
| Sonal N. Mehta | Joshua R. Thane |
| Byron C. Beebe | **Haltom & Doan** |
| Anant N. Pradhan | |
| Joshua P. Davis | |
| Nathan Greenblatt | |
| Timothy E. Demasi | |
| **Weil, Gotshal & Manges LLP** | |

# <u>TABLE OF CONTENTS</u>

**Page**

CERTIFICATE OF INTEREST ................................................................... i

TABLE OF AUTHORITIES ......................................................................v

TABLE OF ABBREVIATIONS AND CONVENTIONS .................................... vii

STATEMENT OF RELATED CASES ..................................................1

STATEMENT OF JURISDICTION..................................................2

INTRODUCTION ...............................................................................3

STATEMENT OF ISSUES .......................................................................7

    A.    Digital Reg's Appeal ..........................................................7

    B.    Adobe's Cross-Appeal ......................................................8

STATEMENT OF THE CASE...........................................................8

    A.    Digital Reg ...........................................................................8

    B.    Adobe ...................................................................................9

    C.    This Case Started In The Eastern District Of Texas ...........9

    D.    The Case Narrowed As Digital Reg Abandoned Claims And Defendants Settled.................................................10

    E.    The District Court Struck Digital Reg's Damages Report On The Cusp Of Trial................................................11

    F.    Trial ...................................................................................13

        1.    Adobe Proves That The Digital Reg's Patents Are Invalid......13

            a.    The '541 Patent.............................................13

            b.    Professor Schull Explains His Prior Art Softlock System..................................................15

            c.    Professor Wicker Establishes Why Softlock Invalidates The '541 Patent ...........................16

            d.    Professor Keller Fails To Respond Meaningfully..........21

            e.    The Jury Found All The Asserted Claims Obvious And Thus Invalid ......................................22

2.      Digital Reg Encourages Inventor Patrick Patterson To Violate His Sworn Commitment Not To Change His Testimony.................................................................23

3.      Digital Reg's Attempt To Show Adobe Knew Of The Digital Reg Patents Exposes Discovery Misconduct...............25

G.      Digital Reg's Post-Trial Motions Are Denied ..................................29

        a.      Digital Reg's Pre-Verdict JMOL Motion......................29

        b.      Digital Reg's Renewed JMOL Motion Is Denied..........29

        c.      Digital Reg's New Trial Motion Is Denied ...................30

H.      Exceptional Case Declared..............................................................31

1.      Adobe Files An Exceptional Case Motion Based On Multiple Grounds .......................................................31

2.      The District Court Grants The Motion In Part And Denies It In Part .................................................................32

SUMMARY OF ARGUMENT .................................................................33

ARGUMENT ............................................................................................37

A.      The District Court Properly Denied Digital Reg's JMOL Motion ........................................................................37

1.      The Standard Of Review.........................................................37

2.      There Is Substantial Evidence To Support The Jury's Obviousness Verdict ...................................................38

3.      Digital Reg's Arguments Regarding The Alleged Lack Of A Motivation To Combine Are Meritless............................41

        a.      It Was Obvious To One Of Ordinary Skill In The Art To Generate A Permission At The Client Based On A Yes/No Indication From The Server..........46

        b.      It Was Obvious To One Of Ordinary Skill In The Art To Employ A File To Transmit A Yes/No Indication From The Server............................................55

4.      Digital Reg's Secondary Consideration Argument Is Meritless.....................................................................57

B.    The District Court Properly Denied Digital Reg's New Trial Motion ....................................................................................63

C.    The District Court's Ruling Regarding The RPX Agreement Was Not An Abuse Of Discretion......................................64

CROSS-APPEAL ARGUMENT...................................................................64

THE DISTRICT COURT'S EXCEPTIONAL CASE RULING SHOULD HAVE BEEN BROADER................................................................64

A.    The Standard Of Review ....................................................64

B.    The District Court Erred By Overlooking Digital Reg's Litigation Misconduct In Its Damages Case ......................65

    1.    Digital Reg's Original Damages Report Was Egregious .........66

    2.    Digital Reg's Second Damages Expert Report Was Unauthorized and Improper ......................................70

    3.    Digital Reg's Third Report "Troubled" The District Court.........................................................................72

    4.    Digital Reg's Misconduct Was Highly Prejudicial To Adobe .................................................................73

    5.    Digital Reg's Pattern Of Misconduct Should Have Been Considered ................................................73

C.    This Court Should Remand This Case For An Accounting Of Fees Attributable To Digital Reg's Submission Of An Implausible Damages Report ............................................74

CONCLUSION .......................................................................................75

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Chiron Corp. v. Genentech, Inc.*,
   363 F.3d 1247 (Fed. Cir. 2004) .........................................................................58

*Cooter & Gell v. Hartmarx Corp.*,
   496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990) ....................................65

*Digital Reg of Texas, LLC v. Argus Software, Inc.*,
   15-cv-00739 ...........................................................................................................1

*Digital Reg of Texas, LLC v. ECI Software Solutions, Inc.*,
   15-cv-00740 ...........................................................................................................1

*Digital Reg of Texas, LLC v. GlobalSCAPE, Inc.*,
   15-cv-00741 ...........................................................................................................1

*Digital Reg of Texas, LLC v. Maketech Sys., Inc. d/b/a DocuDesk Corp.*,
   15-cv-00745 ...........................................................................................................1

*Digital Reg of Texas, LLC v. Seimens Product Lifecycle Management Software, Inc.*,
   15-cv-00742 ...........................................................................................................1

*Digital Reg of Texas, LLC v. SolarWinds, Inc.*,
   15-cv-00743 ...........................................................................................................1

*Digital Reg of Texas, LLC v. Texas Instruments Inc.*,
   15-cv-00744 ...........................................................................................................1

*DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*,
   464 F.3d 1356 (Fed. Cir. 2006) .........................................................................44

*Gardner v. TEC Sys. Inc.*,
   725 F.2d 1338 (Fed.Cir.1984) (en banc) ..........................................................37

*Hewlett-Packard Co. v. Mustek Systems, Inc.*,
   340 F.3d 1314 (Fed. Cir. 2003) ................................................................ 42, 64

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*,
   ___ U.S. ___ 134 S.Ct. 1744 (2014)........................................................ 64, 65

*i4i Ltd. Partnership v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010) ...........................................................................57

v

*In re Gartside*,
   203 F.3d 1305 (Fed. Cir. 2000) ..........................................................50

*In re GPAC Inc.*
   57 F.3d 1573 (Fed.Cir.1995) .............................................................61

*KSR Intern. Co. v. Teleflex Inc.*,
   127 S.Ct. 1727 (2007)................................................... 43, 44, 45, 50

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51 (Fed. Cir. 2012) ............................................................69

*LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*,
   275 F.3d 1347 (Fed. Cir. 2001) .........................................................37

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) .........................................................70

*mFormation Technologies v. Research in Motion Ltd.*,
   764 F.3d 1392 (Fed. Cir. 2014) .........................................................37

*Perfect Web Techs., Inc. v. InfoUSA, Inc.*,
   587 F.3d 1324 (Fed. Cir. 2009) ................................................. 45, 52

*Pregis Corp. v. Kappos*,
   700 F.3d 1348 (Fed. Cir. 2012) .........................................................38

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) ................................................. passim

## STATUTES

28 U.S.C. § 1295 .....................................................................................2

28 U.S.C. § 1331 .....................................................................................2

28 U.S.C. § 1338 .....................................................................................2

35 U.S.C. § 285 ................................................................................2, 64

## <u>TABLE OF ABBREVIATIONS AND CONVENTIONS</u>

| | |
|---|---|
| Adobe | Adobe Systems, Inc. |
| Digital Reg | Digital Reg of Texas, LLC |
| '541 Patent | U.S. Patent No. 6,389,541 |
| '741 Patent | U.S. Patent No. 7,421,741 |
| '670 Patent | U.S. Patent No. 6,751,670 |
| AOB | Appellant's Opening Brief ("Brief for Plaintiff-Appellant") |

## STATEMENT OF RELATED CASES

No other appeal in or from the same civil action or proceeding in the lower court has been before this or any other appellate court.

This is an appeal from an invalidity judgment for United States Patent No. 6,389,541.  Notwithstanding that judgment, Appellant Digital Reg of Texas, LLC has asserted that patent against seven companies in the Eastern District of Texas.  Specifically, on August 12, 2015, Digital Reg asserted the '541 Patent in these cases:  *Digital Reg of Texas, LLC v. Argus Software, Inc.*, 15-cv-00739; *Digital Reg of Texas, LLC v. ECI Software Solutions, Inc.*, 15-cv-00740; *Digital Reg of Texas, LLC v. GlobalSCAPE, Inc.*, 15-cv-00741; *Digital Reg of Texas, LLC v. Seimens Product Lifecycle Management Software, Inc.*, 15-cv-00742; *Digital Reg of Texas, LLC v. SolarWinds, Inc.*, 15-cv-00743; *Digital Reg of Texas, LLC v. Texas Instruments Inc.*, 15-cv-00744; and *Digital Reg of Texas, LLC v. Maketech Sys., Inc. d/b/a DocuDesk Corp.*, 15-cv-00745.  Those cases may be directly affected by the Court's decision in the pending appeal because Digital Reg may be asserting in those new cases the claims adjudged invalid in the District Court in this case.

## STATEMENT OF JURISDICTION

The District Court had jurisdiction of this patent case pursuant to 28 U.S.C. §§ 1331 and 1338.  Adobe appeals the District Court's partial denial of attorneys' fees under 35 U.S.C. § 285.  The Court's final order on Adobe's fee motion was entered on May 1, 2015.  Adobe filed a timely notice of appeal on June 1, 2015.  This Court has jurisdiction pursuant to 28 U.S.C. § 1295.

# INTRODUCTION

Digital Reg started this litigation by asserting seven patents against Adobe in pursuit of its nuisance settlement strategy. But Adobe did not believe it infringed Digital Reg's patents and so it set out to disprove the allegations against it rather than agreeing to pay off Digital Reg. As it turned out, seven other defendants in this case settled and one prevailed on summary judgment, leaving only Adobe.

Digital Reg's case against Adobe collapsed when put to its merits. Digital Reg abandoned or lost on five of the seven patents it originally asserted. At trial Adobe proved that both remaining patents were obvious. In the course of losing Digital Reg committed serious litigation misconduct. Indeed, the District Court declared this an "exceptional" case, requiring Digital Reg to reimburse Adobe for its resulting legal fees. Digital Reg's no-holds-barred litigation approach is consistent with the admission at trial of its principal, Mike Farley, that Digital Reg is motivated by "greed."

On appeal, Digital Reg challenges only the jury verdict of obviousness for its '541 Patent. Digital Reg's appeal is meritless. The evidence of obviousness is overwhelming and certainly is sufficient to support the jury verdict.

The prior art Softlock system for controlling access to digital content is remarkably similar to the claimed system. Professor Schull, the inventor of

Softlock, explained to the jury how his patented system works in helpful detail. The small difference between the '541 Patent and Softlock is that the '541 Patent discloses the client (the user's computer) granting the ultimate "permission" to access digital content whereas in Softlock the permission comes from the server.

Adobe's expert, Professor Wicker, explained that there was nothing inventive in this design choice. Locating the permission-generation function at the client as described in the '541 Patent would have been obvious to those skilled in the art because there was an established desire to reduce the complexity of the server and to off-load work to the client. He also explained that locating the permission-generation function as set forth in the '541 Patent was well within the basic competency of one skilled in the art. Professor Wicker thus concluded that there was nothing inventive in the asserted claims.

The response by Digital Reg's validity expert, Professor Keller, is telling. Professor Keller did *not* challenge Professor Wicker's testimony that a person of ordinary skill could readily design a system, like the system of the '541 Patent, with the permission-generation at the client based on their basic skills. Nor did he attempt to challenge Professor Wicker's explanation of why there would be a motivation to make such a system. He did not attempt to establish that any secondary considerations supported the non-obviousness of the '541 Patent. In

4

short, he did not identify anything inventive in the '541 Patent's design choice of locating the permission granting entity at the client instead of the server or attempt to explain why the differences between Softlock and the '541 Patent were not obvious.

Based on this record, the jury's obviousness verdict is not only understandable, it is strongly supported by competent evidence and persuasive reasoning.

Digital Reg secondarily challenges an evidentiary ruling. Specifically, Digital Reg complains that the District Court abused its discretion when it allowed Digital Reg to rely on the RPX agreement, but not to identify the amount of money it received from RPX. Digital Reg argues that this amount is relevant to obviousness.

The District Court excluded the amount of the RPX agreement because Digital Reg's patent valuation expert deemed it irrelevant, explaining "I don't think it is useful for this case." When the District Court granted Adobe's request to exclude the amount of the RPX agreement in limine to avoid the prejudice on the damages issue of a large, but irrelevant, number, Digital Reg did ***not*** argue that the amount was relevant to obviousness. That theory is an afterthought. Regardless, Digital Reg informed the jury that the RPX deal was a "very large

5

license agreement," rendering its complaint about the exclusion of the actual amount immaterial for this additional reason.

Adobe cross-appeals the District Court's "exceptional" case finding because the District Court overlooked the egregiousness of Digital Reg's conduct in its damages case. Indeed, in striking Digital Reg's damages opinion in total on the eve of trial, the District Court severely criticized its damages theory on multiple grounds. As one example, Digital Reg proposed a 50% percent profit split with Adobe based on nothing more than some vague experiences its expert had where he reportedly saw parties split profits evenly – without tying this split to the facts of this case. He did not describe the circumstances, explain how frequently they occur, or even why they would be relevant to this case. Because this profit split opinion was not based on any authority, or the facts of this case, the District Court condemned Digital Reg's position as "even more arbitrary than the [25%] rule rejected in *Uniloc*."

The assertion of pie-in-the-sky damages opinions – such as the opinion here – is too common and imposes an undue burden on the system. Digital Reg submitted an inflated damages report to try to force settlement, knowing that it would not be challenged until the pretrial conference. In such circumstances, trial courts are faced with the untenable choice of delaying trial, imposing a new report

6

on the defendant with a new round of expert discovery during trial, or allowing a defective damage theory to go trial with the hope that the verdict or post-trial motions clean it up. In this case, the District Court struck the report, but Adobe was ultimately forced to respond to new reports, file *Daubert* motions and perform deposition discovery while in trial. Those costs should be borne by Digital Reg, not Adobe.

The District Court was unduly lenient in overlooking this behavior when it declared this an "exceptional case" based on other misconduct. The District Court did not consider its own scathing findings about the meritlessness of Digital Reg's damages theory and a host of other aggravating circumstances. In sum, the invalidity verdict should be affirmed and the case remanded to address Digital Reg's litigation misconduct in its approach to damages.

## STATEMENT OF ISSUES

### A.    Digital Reg's Appeal

Did the District Court properly uphold the jury's invalidity verdict of obviousness regarding the asserted claims (1, 2, 4, and 13) of the '541 Patent by:

1)    denying Digital Reg's JMOL motion because there is substantial evidence that Professor Schull's patented Softlock system renders those claims obvious?

7

2)    acting within its discretion to deny Digital Reg's new trial motion because the verdict was not against the great weight of evidence?

3)    acting within its discretion to allow Digital Reg to rely on the RPX agreement, but not to introduce into evidence the amount of the transaction?

### B.    Adobe's Cross-Appeal

Did the District Court err by failing to include within its exceptional case determination Digital Reg's misconduct in presenting an indefensible damages report that was struck on the eve of trial, creating an expensive fire drill?

## STATEMENT OF THE CASE

### A.    Digital Reg

Digital Reg of Texas, LLC (Digital Reg) was incorporated in 2007. A11168:18-11169:19.  The principals of Digital Reg are Mike Farley and Chip Venters.  A11136:3-12.

Digital Reg's business is patent enforcement.  A11192:4-12.  It has no products and never intended to offer products.  *Id.*

Digital Reg's patents were originally sought by Deskgate.  A11146:2-11147:15.  After that business failed, the principals of Digital Reg purchased the patent rights out of bankruptcy.  A11149:1-11150:10; 11155:1-11156:23.

Digital Reg's first patent enforcement effort resulted in litigation against several defendants, including Hustler.com, Playboy, Microsoft, Apple, Sony,

8

Macrovision, and Blockbuster. A11172:19-22, 11179:16-19, 11182:22-11183:9, 11229:5-11230:13. Digital Reg had a focus on the adult entertainment industry to monetize its patent. A11184:15-21, 11229:11-22. Digital Reg's principal, Michael Farley, admitted at trial that he was motivated by "greed" in targeting that industry. A11268:19-11269:2.

### B.    Adobe

Founded in 1982, Adobe is a global leader in digital marketing and digital media solutions. A12041:7-25. It is widely known for its Photoshop, Flash, and Acrobat products and development of the "PDF" file format. A12042:20-12043:5.

Adobe owns thousands of patents and has a deep respect for intellectual property. A12044:17-25. It routinely licenses technology where appropriate. *Id.* Adobe's corporate representative, Paul Betlem, explained that Adobe did not take a license to the Digital Reg patents because "it wouldn't make sense for us to pay to license those patents when we are, in fact, not taking advantage of them." A12047:14-18.

### C.    This Case Started In The Eastern District Of Texas

Digital Reg filed its initial complaint in this matter on April 21, 2011. A14166. The initial complaint was dismissed without prejudice on June 17, 2011. Digital Reg had forfeited its corporate charter by failing to pay its corporate taxes, rendering the complaint defective. A14166.

9

Digital Reg ultimately paid its back taxes, reinstated its charter, and filed a second lawsuit containing similar allegations against the same core defendants: AVG Technologies USA, Inc.; Adobe; Electronic Arts, Inc.; Intuit Inc.; Symantec Corporation; UbiSoft Entertainment, Inc.; Valve Corporation; Zynga Gaming Network Inc.; and Zynga, Inc.  A14166.

Adobe and the other defendants moved to transfer this case to the Northern District of California.  Digital Reg opposed.  Because seven of the nine defendants were headquartered in Northern California, the District Court agreed that the Northern District of California was clearly more convenient and transferred the case.  A14173-14174.  Upon transfer, the case was assigned to Judge Claudia Wilken.  A14175.

### D.    The Case Narrowed As Digital Reg Abandoned Claims And Defendants Settled

As this litigation proceeded before Judge Wilken, the case narrowed through motion practice, claim abandonment, and Digital Reg's nuisance value settlement strategy.  Digital Reg settled with seven of the nine original defendants.  A10528.  All these settlements were for less than the cost of defense and a mere fraction of what Digital Reg claimed in damages.  Indeed, most claims were settled for less than $500,000, with one settlement as low as $50,000.  A10845.  Showing the disparity between Digital Reg's claims and its settlement values, Digital Reg

10

settled with Symantec shortly before trial for $450,000, even though it had argued in its damages expert's report that it had been damaged for over $167,000,000. A13851. An eighth defendant, UbiSoft, prevailed on summary judgment, leaving Adobe as the only defendant for trial. A74-75.

Although Digital Reg originally asserted seven patents against Adobe, only two remained for trial. Digital Reg abandoned four patents. Of the remaining three patents, the '741 Patent was eliminated on summary judgment. A74. Digital Reg does not challenge on appeal its '741 Patent loss.

Thus, only the '541 and '670 Patents remained for trial.

### E. The District Court Struck Digital Reg's Damages Report On The Cusp Of Trial

Six days before trial, on Tuesday, August 19, 2014, the District Court struck the expert report submitted by Digital Reg's damages expert, Randall Parr. A76. The District Court identified fundamental legal and factual errors throughout the report. As the Court found, Mr. Parr's report was "inherently unreliable," A77-79, Mr. Parr's profit split analysis was "even more arbitrary than the rule rejected in *Uniloc*," A81-82, Mr. Parr's decision to assert an entire market value analysis "cannot be justified," A82-84, and Mr. Parr's alternative calculation in which he proportionally increased his royalty rate to offset a decreased base "contravenes Federal Circuit precedent." A84.

11

Although Mr. Parr's damages testimony was "excluded in full," the Court allowed Digital Reg to file a new report days before trial. A84-85. The report was due three days before trial and Adobe was expected to depose Mr. Parr on the new report during trial. A85.

After Digital Reg submitted its revised report, Adobe again moved to exclude Mr. Parr's testimony based on additional problems with his report, including that his royalty rate did not change regardless of the factual inputs or methodology he used in his calculations. A14176-14177. While the District Court did not strike Mr. Parr's supplemental report (the third he offered), the Court did find that "Mr. Parr's perpetual conclusion of the same 2.5% royalty rate, regardless of inputs or methodology, is troubling." A14182:5-14183:26.

At the pretrial conference, but before issuing its written ruling on Adobe's motion to strike Mr. Parr's initial report, the Court suggested it would exclude Mr. Parr totally and expressed concern about how to proceed to trial. A9827:6-8 ("I don't know what we would do if we did have to exclude him on Daubert grounds"); *id.*:13-14 ("My real concern is what we would do if – if you didn't have that witness."; A9831:18-20 ("What would be left if – if Parr wasn't to testify …continue the case or appeal the case"); A9848:4-6 ("I am very concerned with this witness, so I think you better start thinking about what you will do and – what

12

you could do.").

After the conference, but before the Court's written ruling issued, Digital Reg submitted an untimely and legally flawed second damages report to which Adobe promptly objected, noting that the report suffered from another set of fundamental problems. A14185-14190. The Court excluded this report in total, finding that it was untimely and unauthorized. A85; A14181:18-22.

### F.    Trial

Trial started August 25, 2014 based on the two surviving patents ('541 and '670 Patents) of the original seven. Adobe successfully proved the asserted claims of both patents were invalid and Digital Reg was found to have engaged in litigation misconduct at trial.

### 1.    Adobe Proves That The Digital Reg's Patents Are Invalid

At trial Adobe presented substantial evidence that the asserted claims of the '541 and '670 Patents are invalid. This included evidence from prior art inventor Professor Jon Schull, and Adobe's technical expert Professor Stephen Wicker. The jury found the asserted claims obvious. A12912-12913.

### a.    The '541 Patent

The '541 Patent describes a system for regulating access to digital content such as software programs or digital books. In particular, it limits access to content "until a payment or use authorization occurs." A263 at Abstract. Digital

Reg asserted independent claim 1 against Adobe:

> A computer-implemented method of regulating access to digital content, the method comprising:
>
>> at a client, executing an access checking process to determine whether the client holds a pre-existing permission for a resource to access the digital content,
>>
>> if not, requesting permission from an external source for the resource to access the digital content;
>>
>> receiving from the external source a token; and
>>
>> based on the received token, executing an installation process that generates at the client a permission that is locked uniquely to the client and that may be found by a later execution of the access checking process.

A283(12:31-43).

As Professor Wicker explained, the first step occurs at a client, such as a laptop, and involves checking locally to determine whether the client already has access to use the content. A11583:21-11584:6. If access is not found, the next step is to request permission from an external source such as a licensing server for access to the content by, for example, sending payment. A11584:4-19. Then, in response to that request, a token is provided from the server to the client that simply indicates whether access by the client is approved or rejected. A11584:21-11585:12. Finally, if the token indicates a yes (approval) to use the content, the client will generate and save a key based on, for example, the client's machine

14

identification so that the next time the client wants to view the content, there will be no need to contact the server because the access check will find the key. A11585:23-11589:17.

### b. Professor Schull Explains His Prior Art Softlock System

Adobe presented Professor Jon Schull to describe his patented prior art system, known as Softlock, which renders the '541 Patent obvious. A12060:16-18, 12066:18-12072:7. Softlock originated as a way to control the distribution of a computer program Professor Schull created. A12068:3-11. To use premium features of Professor Schull's program, users would have to telephone and purchase an unlocking code that would allow them to use the locked features. A12068:20-12069:4. To avoid the burden of a telephone call and to automate the process, by approximately 1993 (years before the filing of the application for the '541 Patent), Professor Schull had started a company, moved his process into email and internet uses, and received a patent on his invention. A10584-10600, 12069:5-22, 12072:4-7, 12106:2-25.

Professor Schull's testimony regarding the operation of his Softlock system was introduced without any rebuttal or meaningful cross examination. The Softlock system would perform a local check to determine if a user had a pre-existing permission to access the features. A1233:7-9. It allowed a person holding

15

a valid password to access locked software features. *Id.*:4-6. But, when that person did not have a password, they were "invited to purchase the advanced features." A12109:13-12112:18. A licensing server would receive and process a purchase request and send an encrypted seed, called a Password, back to the purchaser, authorizing access to the software. A12112:8-12115:18. The Password, which could be used to access the content, was then installed on the user's computer for later use. A12117:8-15.

Professor Schull explained that Softlock, as described in his patent, had been fully developed and released as a commercial system by 1993. A10809-10834, 12106:2-12107:17, 12119:5-12125:1.

### c. Professor Wicker Establishes Why Softlock Invalidates The '541 Patent

Adobe presented Professor Wicker to explain how the Softlock system renders the asserted claims of the '541 Patent obvious. A121426:14. Professor Wicker focused on the teachings of the Softlock Patent and compared it directly to the '541 Patent's asserted claims.

Professor Wicker explained that the Softlock system was very similar to the system described in the '541 Patent and served the same purpose. Like the '541 Patent, the invention in Professor Schull's patent included a check for a local password when one attempts to access content; and if no password is found, a

16

request is made to an external source for permission to access the content. Professor Wicker then mapped the patent to the claims asserted at trial. A12146:1-12163:14. Professor Wicker demonstrated, with citations to Professor Schull's patent, that Softlock:

(1) was a computer program which regulated access to digital content, A10588(2:66)-10589(3:33), 10589(3:49-52), 12146:5-13;

(2) that engaged in significant client-side processing, A10590(5:33-40), 12147, to (a) check for permission to access content by looking for a stored Password, A10590(5:40-47), 12147:12-12148:3; (b) if needed, request permission from a remote location to access the content, A10590(5:59-63), 10592(10:50), 12149:17-12150:5; (c) receive an encrypted seed, called a Password, if the request for permission is granted, A10587 at Fig. 2, 10590(5:64-6:5), 12151:3-19; and (d) locally decrypt and save the Password so that the seed may allow access to the content both immediately and in the future. A10585 at Abstract; 10590(6:6-11); 10593(11:35-40), 12148:9-16, 12153:18-24, 12157:1-24, 12160:11-24. Moreover, Professor Wicker explained that the Password was locked uniquely to the client machine, A10585 at Abstract; 10590(6:6-11); 10591(7:10-15), 12157:1-12, 121626:16; and the request for access triggers an authorization process, run through an authorization channel. A10586 at Fig. 1, 12163:1-12.

17

Professor Wicker further explained that the claims of the '541 Patent were invalid in light of the Softlock system both when the Court's constructions were properly considered and when they were viewed in light of Digital Reg's flawed analyses.

Digital Reg argued for infringement purposes at trial that the token requirement was met by transmitting an encrypted key or password from a server to the client. Even though that construction of the claims was improper, Professor Wicker provided unrebutted testimony that Softlock used a token under that reading. A12151:20-12152:17.

Professor Wicker also explained why the claims were obvious applying a proper reading of the claims. Professor Wicker testified that Softlock disclosed generating a token after receiving authorization through an independent channel – the authorization channel. A12149:18-12150:5, 12152:5-12153:8, 12163:7-12 (noting in context of authorization procedure requirement that if authorized "we generate the password"); 12207:8-12208:5.

In view of Professor Schull's testimony that all that is necessary to generate a permission locally in Softlock is "just move the code that runs on the server into the client program," A12118:9-13, Professor Wicker agreed that simply moving the password-generation code to the client would obviously result in the use of a

18

token.  A12152:21-12153:2 ("Q.  So, then, what is your opinion with respect to invalidity? A.  Okay.  Well, basically, I think it would have been obvious to create a yes/no indication, and then send it to the client and have the password generated at the client.  In fact, you heard Dr. Schull say that just a few moments ago.  There are things that are done at the server in his invention that can be done at the client."); 12158:24-12159:2 ("Well, I note that Dr. Schull actually talked about doing things at the client.  And it would have been obvious to transmit that yes/no and let the client do the work instead of the server.").

Professor Wicker also explained that one of ordinary skill would be motivated to move the code to the client because such an action was known in the prior art and because there had been a trend "over time to try to push out" functionality from the server to the client to reduce server congestion and complexity.  A12207:19-12208:10.

In addition, Professor Wicker explained that the Softlock Password was, indeed, a file as required by the Court's construction because such a structure is a necessary aspect of any system where the token is sent over the internet. A12194:15-20 (Q.  Okay.  And that is not a file, is it?  A.  Well, it depends on the context.  In other words, if I'm transmitting it through the internet it will be a file in the sense it is something that has been embedded in the datagram, and

19

something that has to be manipulatable by the various layers of the receiver.")

Similarly, under a proper understanding of the requirement that the permission be generated at the client, Professor Wicker provided extensive testimony on why the '541 Patent is invalid in light of Softlock. Professor Wicker explained that one of ordinary skill in the art at the relevant time frame would be familiar with the limitations of generating passwords at the server and the advantages of moving that process to the client. A12207:19-12208:10. As Professor Wicker testified, a person of skill in the art "would have known how to use the software functionality that was in the server to duplicate that functionality at a client. It is something that would have been well within their abilities." *Id.* With respect to the motivation to make this change, Professor Wicker explained that one of ordinary skill in the art would be motivated to make, and be capable of making, such changes because: "there are reasons why you might want to offload some complexity from the server. Especially in the earlier years, complexity was an issue at servers. And the more complicated the server, the more likely you would have problems. So there has definitely been an effort over time to try to push out some of that functionality. Now, a person of skill in the art . . . would have known how to use the software functionality that was in the server to duplicate that functionality at a client. It is something that would have been well

within their abilities." *Id*.

All this was consistent with the express teachings of the Softlock Patent, which provided that "the method by which the Programmer's Program [the client] determines the validity of the password is: ***use the same method to generate the Password in the User's processor***, compare the password generated to the candidate password, deem the candidate password valid if it is identical to the generated password." A10591(8:66)-10592(9:4)[1]. In other words, Professor Schull's patent directly disclosed the placing of the same password-generation software on both the server and the client, just as Professor Wicker testified one of ordinary skill in the art would know how, and be motivated, to do.

### d.    Professor Keller Fails To Respond Meaningfully

To attempt to defend the validity of its patent, Digital Reg offered the testimony of Professor Arthur Keller, its validity expert. As it turned out, Professor Keller's testimony, in essence, addressed anticipation, not obvious. He focused on the difference between Softlock and the claimed inventions, but did not address whether the difference was inventive.

Professor Keller initially told the jury that none of the requirements of the '541 Patent was disclosed in Professor Schull's patent. A12234:22-12237:17.

---

[1] Emphasis supplied throughout unless otherwise noted.

Upon cross-examination, however, Professor Keller admitted there were only two disputed claim requirements: the disclosure of a token and the generation of a permission at the client.  A12264:8-13.  At no point, did Professor Keller challenge the testimony of Professor Schull regarding the operation of his patented Softlock system.

On the key obviousness issues, Professor Keller was silent.  Professor Keller asserted generally there was no "token" disclosed in in Professor Schull's patent, A12235:15-17, but never contested Professor Wicker's testimony that one of skill in the art would have been motivated to, and would have known how to, use a token to reduce complexity at the server.  Beyond the conclusory assertion that he believed the patent was valid and not obvious, Professor Keller did *not* contest Professor Wicker's testimony that generating the permission at the client was obvious from the Schull prior art.  A12235:7-23, 12271:20-12273:14.  In the face of Professor Wicker's explanation that there were no secondary considerations, Professor Keller did not even try to identify supporting secondary considerations.

### e.    The Jury Found All The Asserted Claims Obvious And Thus Invalid

After eight days of trial and two days of deliberation, the jury returned a verdict finding all the asserted claims invalid.  A12913.  Specifically, the jury found that Adobe had "proven that it is highly probable that the following claims

22

of Digital Reg's patents would have been obvious to a person of ordinary skill in the field at the time the patent application was filed," and then identified all the asserted claims:  Claims 1, 2, 4, and 13 of the '541 Patent; and Claims 32, 45, and 52 of the '670 Patent.  *Id.*  The parties had agreed to the jury instruction on obviousness, informing the jury of the rules it should apply in reaching its verdict and resolving the parties' factual disputes.  A12336:9-12345:6 (discussion of obviousness instruction), 12396:18-25 (agreement with instructions generally), 12414:19-12417:4 (obviousness instruction).

### 2. Digital Reg Encourages Inventor Patrick Patterson To Violate His Sworn Commitment Not To Change His Testimony

Digital Reg engaged in litigation misconduct at trial that caused the District Court's to declare this an "exceptional case."  One such incident involved Digital Reg's inventor Patrick Patterson.  A11019:19-11020:5, 11171:13-19.  Mr. Patterson is a paid consultant for Digital Reg who shares in a percentage of the money Digital Reg brings in via its enforcement campaign for acting as a witness and thus helping the litigation effort.  *Id.*

Digital Reg called Mr. Patterson as its lead witness at trial to discuss when and how he conceived of the inventions claimed in his patents.  Mr. Patterson's testimony focused on an alleged "invention" document he supposedly provided to

23

a third party.  A11031:21-11032:7.

The alleged "invention" document was a focus in Mr. Patterson's deposition because it had been identified by Digital Reg during discovery as its key proof of invention.  A9283, 9285-9287.  Even though he was part of the Digital Reg litigation team, and was prepared by, and represented at his deposition by Digital Reg's trial counsel, Mr. Patterson testified three times that he did ***not*** even know who wrote the document.  A11057:10-17, 13833(203:21-204:5).  He testified that he had never read the document, had no idea when it was created, and did not remember providing any confidential information about his invention to the addressee, Pat Dane.  A13833(204:21)-13834(205:6).  Mr. Patterson further swore under oath that his testimony on these questions would ***not*** change at trial.  A13834(205:21-24) ("And just to be clear, if called to testify at trial, your testimony will be the same as it is here today.  Correct?  A. Yes, un-huh.").

Shockingly, in his trial testimony, in direct response to questioning from Digital Reg's counsel, Mr. Patterson reversed his sworn testimony and violated his commitment not to change his position.  At the prompting of Digital Reg's counsel, viewing the alleged "invention" document he had originally denied recognizing, he suddenly identified it as an important document that he had written himself.  A11031:24-11032:2, 11035:5-8.  And even though Digital Reg's trial

team knew that Mr. Patterson had totally sworn off the document in deposition, it presented Mr. Patterson as fluent with the document at trial.  Mr. Patterson testified that he "wrote everything on these papers, yes I did" and that, not only did he recognize the document, but that it disclosed his invention, had been made for Pat Dane, and needed to be protected because he "didn't want somebody to get their hands on it and try to get a step ahead of me by, you know, doing the same thing I was doing."  A11035:15-18, A11037:4-10, 11040:2-11041:7.

Adobe promptly objected to this outrageous about-face.  The District Court allowed Digital Reg the benefit of the doubt that the document was authentic but found that in deposition Mr. Patterson "was not being cooperative.  He was being recalcitrant.  He was being a jerk.  I don't know what he was doing, but he was saying for whatever reason that he didn't recognize it.  But clearly it was his document."  A12312:5-11.  The Court further noted that Mr. Patterson's changed testimony "was a rather egregious change of heart" that needed to be mitigated in some manner.  A12296:14-15.  Again, this all generously assumes the document was truly authentic in the first place.

### 3.    Digital Reg's Attempt To Show Adobe Knew Of The Digital Reg Patents Exposes Discovery Misconduct

Serious litigation misconduct was also exposed during the testimony of Digital Reg principal Chip Venters.  The District Court relied on this wrongdoing

25

as a second basis to find this case exceptional.  A131-135.

Digital Reg used Mr. Venters to argue that it had informed Adobe of the patents-in-suit years before this litigation during an alleged meeting (which turned out to be an alleged phone call) with an investment company affiliated with Adobe.  A11270:5-9, 11282:2-18, 11284:2-8.   Mr. Venter's testimony turned on the authenticity of a draft document, called the Adobe Value Proposition, that he claimed was a script for the alleged call.   A13840(334:10-335:3).   The draft document that Mr. Venter's relied at trial, however, was not the same document identified at his deposition.  When Digital Reg sought to explain the difference, its attorney's argued that Digital Reg did not want to "burden the evidence" with competing documents.  A11414:10-22.  As it turned out, and Adobe only learned at trial, there existed numerous incomplete drafts of this document with important differences – such as whether they listed the numbers of both the patents-in-suit or not.  A132-133.

Adobe objected to the introduction of the particular draft Digital Reg sought to introduce explaining that the draft offered at trial was different from the draft identified at his deposition and that none of the multiple drafts provided in discovery could reliably be identified as the correct document, even assuming a call had occurred.  A11221:12-11227:3, 11286:4-9.  The draft introduced at trial

26

had comment bubbles and was obviously not a final document.  A11285:11-18, 11309:14-11310:18, 14191-14200.

In response, Digital Reg's counsel untruly represented to the District Court – without qualification – that Trial Exhibit 125c (the draft Digital Reg was attempting to use at trial) was "the copy that [Mr. Venters] sent to Adobe and walked through with Adobe during the 2004 meeting."  A11221:8-11.  Counsel further stated that "when Adobe's counsel is referring to subsequent versions that have edits, we produced all versions of the Adobe Value Proposition.  It was drafted for the 2004 meeting, and this is the version that Chip used when he was on the phone with Adobe to walk through the patents and provide notice to Adobe."  A11222:17-22.

However, during his testimony on Trial Exhibit 125c Mr. Venters confirmed that, despite counsel's unqualified representations to the Court and the production of multiple versions of the Adobe Value Proposition, "none of the versions [Digital Reg] produced are the one that you say you actually sent to Adobe."  A11307:25-11308:2.  Surprisingly, on a *voir dire* examination regarding these irregularities at trial outside the presence of the jury, Mr. Venters claimed to still have the disputed (albeit unproduced) document in his possession.  A11306:17-22 ("Q.  And you actually don't have the document that you say you sent to Adobe? Right?  A.  I do,

27

it is just not in the record. . . . I have – I have the document. You just haven't had the one that was internal.").

The Court ordered this draft to be produced, but Digital Reg failed to comply and instead produced two other drafts that had not been produced in discovery. A11433:10-11434:5, 11658:2-11659:15. At the same time, Digital Reg's counsel refused to admit – both in oral and written statements – that the proper version of the Adobe Value Proposition document had not been produced. A11662:6-19, 14204.

In the face of continued problems with Digital Reg's production, and the shifting explanations, the District Court ordered a mid-trial deposition of Mr. Venters and forensic inspection of his laptop. A11674:9-20, 11676:4-22. This deposition confirmed that Digital Reg had not produced the document Mr. Venters claimed to possess and that the document must have been (improperly) destroyed. A13845(47:5)-13846(59:5). Additionally, counsel's representations that the document had been collected and produced were untrue. A13844(34:16-35:8). As a result, the Court removed Trial Exhibit 125c from the record, in favor of a different version, A10846-10855, and included a curative instruction to mitigate the prejudice to Adobe, explaining the discrepancy in Mr. Venters' testimony to the jury. A12412(4:18).

### G.   Digital Reg's Post-Trial Motions Are Denied

#### a.   Digital Reg's Pre-Verdict JMOL Motion

At the close of evidence, Digital Reg made a limited motion for JMOL under Federal Rule of Civil Procedure 50(a).   A12709.   Digital Reg's motion contained only one paragraph addressing whether Adobe had produced sufficient evidence that the '541 Patent was obvious, stating only that two elements were missing and could not be obvious because they were not a design choice "proposed by Schull."   A12713-12714.   Digital Reg similarly objected to the evidence showing invalidity of the '670 Patent.   A12714.   These motions were denied. A109.

#### b.   Digital Reg's Renewed JMOL Motion Is Denied

After the jury returned its invalidity verdict Digital Reg filed a renewed JMOL under Rule 50(b) and for a new trial under Rule 59.   A13653.   Digital Reg only moved with respect to the '541 Patent, however, abandoning its '670 Patent. *Id.*

Digital Reg argued that Adobe had not established that several claim elements relating to the claimed token and the requirement of generating the permission were present.   A13657.   In addition, Digital Reg argued that Adobe failed to prove a motivation to combine.   A13660-13662.   Finally, in a wholly new argument, Digital Reg argued that there was insufficient evidence on secondary

29

considerations because the Court had excluded reference to the specific amount of revenue related to an agreement with RPX.  A13666-13667.

The Court denied Digital Reg's motion for judgment as a matter of law. A109.  Reviewing the trial record, the Court discussed multiple instances where Adobe presented substantial evidence that all the claim requirements were disclosed in Schull, within the level of skill in the art and/or obvious to combine. A113-116.  The Court observed that much of this evidence went unrebutted at trial. Accordingly, the court found "sufficient evidence in the record to support the jury's determination of obviousness."  A116.

In addition, the Court considered its exclusion of the exact amount of the RPX agreement with respect to secondary considerations of non-obviousness. A116-118.   The Court concluded that exclusion of the amount of the RXP agreement was proper and not prejudicial.  A117-18.

### c.     Digital Reg's New Trial Motion Is Denied

As an alternative request for relief, Digital Reg sought a new trial based on the same arguments it made regarding its renewed JMOL.  A13667-13668.  Digital Reg argued that the great weight of the evidence was against the invalidity verdict and that the exclusion of the exact amount of the RPX agreement was prejudicial error requiring a new trial.  A13668.

The District Court denied this motion as well. Relying on the analysis conducted with respect to Digital Reg's renewed JMOL, the Court found that "the jury's finding that the asserted claims of the '541 Patent were obvious was not contrary to the clear weight of the evidence" and that there was no authority for finding that the dollar value was material or for concluding that "excluding the dollar value alone, while admitting other evidence about the RPX agreement, constitutes grounds for a new trial." A121.

### H.     Exceptional Case Declared

#### 1.     Adobe Files An Exceptional Case Motion Based On Multiple Grounds

Digital Reg's conduct throughout this litigation warranted an exceptional case finding and the reimbursement of Adobe fees. In bringing its attorneys' fees motion to prove this, Adobe focused on four specific grounds that best exemplified why this is an exceptional case:

(1)    Digital Reg improperly presented inventor testimony from Mr. Patterson that he authored an alleged "invention" document even though in deposition he could not identify the document and promised he would not do so at trial;

(2)    Digital Reg engaged in misconduct by presenting Trial Exhibit 125c as the exact version of the Adobe Value Proposition document

31

supposedly provided to Adobe to prove willfulness, even though it later admitted that it was not provided to Adobe and the correct version was destroyed or missing;

(3)     Digital Reg pursued multiple implausible damages theories with severe legal defects that were struck on the eve of trial, inflicting substantial cost on Adobe and creating an unnecessary fire drill to allow for a new damages report; and

(4)     Digital Reg wrongly pursued infringement claims under the '741 Patent by relying on indefensible claim construction positions. A13813-13819.

## 2.     The District Court Grants The Motion In Part And Denies It In Part

The District Court granted Adobe's motion in part. The Court found the case exceptional, concluding that Digital Reg engaged in litigation misconduct based on two grounds. First, the Court found that "Digital Reg failed to produce material documents," specifically the Adobe Value Proposition that was at the heart of Digital Reg's willfulness case, in part because it did not conduct a thorough investigation and that its behavior resulted in considerable costs for Adobe. A131-135. Second, the Court found that Digital Reg acted unprofessionally in knowingly failing for more than a year "to alert Adobe to the

change in testimony" that Mr. Patterson intended to present at trial regarding conception, "understanding that Adobe would have prepared based on misleading information." A135-136.

The Court decided not to award Adobe fees incurred as a result of Digital Reg's tender of a damages report with multiple theories "found to be inconsistent with Federal Circuit case law" and the prejudicial fire-drill that conduct foreseeably caused. A131. The Court found this conduct was not sufficiently egregious to warrant fees because Mr. Parr "was able to cure the deficiencies through adjustments to his methodology." A131. The Court also found that the weakness in Digital Reg's position on the '741 Patent was not so profound as to warrant the reimbursement of Adobe's fees. A129-130.

## SUMMARY OF ARGUMENT

Digital Reg's challenge to the obviousness jury verdict falls far short of the mark. Digital Reg alleges that the jury verdict is unsupported by substantial evidence.

Professor Schull's prior art Softlock system and the claimed inventions are very similar and perform the same function. Both systems regulate access to digital content by authorizing the use of such content when a licensing server authorizes it. The difference is that Softlock generates the permission at the server

33

whereas the claimed inventions generate the ultimate permission at the client.

Adobe's expert, Professor Wicker, explained that locating the permission-generating feature at the client is not inventive.  It was well within ordinary skill to place it at the client in the very way that it is claimed in the '541 Patent.  He explained that there was a motivation to do this because there was a desire to reduce the complexity at the server and to share the work with the client.  This is itself substantial evidence sufficient to support the verdict and that the great weight of the evidence is not against the verdict.

In response to Professor Wicker's testimony, Digital Reg's expert did not address whether the claims were inventive.  He did not challenge Professor Wicker's testimony that it was well within the level of ordinary skill in the art to place the permission-generating feature at the client in the way it is done in the '541 Patent.  Nor did he deny that there was a motive to use the claimed system.  This confirms not only that this appeal lacks merit, but that the jury reached the right result.

Digital Reg's secondary argument is that the District Court abused its discretion by refusing to permit it to rely on the amount of the RPX agreement to support its obviousness position.  The District Court's decision was a sound exercise of its discretion.  Digital Reg's damages expert testified that he did not

34

think the RPX agreement was "useful for this case" because of the unique circumstances and opaque RPX structures.  In opposition to Adobe's limine motion to exclude that agreement based on its admitted irrelevance, Digital Reg argued that it should be considered for damages, but did not contend that it was relevant to obviousness.  The District Court accordingly excluded the amount.

Digital Reg's argument now, that the amount of the RPX agreement is relevant to obviousness, is too little too late.  Digital Reg informed the jury the RPX agreement was a "very large license agreement," "the big one," and "the high number."  This makes the actual amount of the agreement immaterial.  It is also worth noting that Digital Reg made this point in the context of its damages position, not obviousness.  The immateriality of the disputed evidence is also established because the proof of obviousness is so strong and Digital Reg has not explained how the amount of one license, if considered, could, without a nexus showing, establish that the claims are not obvious.  This is especially true because there are so many nuisance value licenses establishing that there is no nexus between the licenses of the '541 Patent and any supposed "respect" for its validity.  The District Court did not abuse its discretion in excluding the amount of the RPX agreement.

Adobe cross-appeals the District Court's "exceptional" case determination.

35

It should have been broader.  While the District Court correctly found that Digital Reg engaged in two major episodes of litigation misconduct, it should not have overlooked the egregiousness of Digital Reg's handling of its damages case – and the burden imposed by this kind of brinksmanship.

Digital Reg's damages report fell below any acceptable standard that should be tolerated.  The District Court documented the many failings of the report in its decision to exclude the report on multiple independent grounds.  This included utter disregard of this Court's precedent.  Yet, it appeared to overlook its own findings and the evidence showing exactly how legally improper that report was.  The District Court also did not address the harm to Adobe caused by the striking of a manifestly defective damages report on the cusp of trial and the introduction of two new expert reports.  Finally, the District Court did not address the fact that Digital Reg's litigation misconduct was part of a pattern of wrongdoing, including the other incidents of misconduct.

The jury verdict of invalidity should be affirmed and this case should be remanded for further proceedings to address Digital Reg's misconduct in its damages case.

# ARGUMENT

Digital Reg's appeal from the District Court's judgment challenges only the invalidation of the '541 Patent. In support, Digital Reg contends that the District Court erred when it denied Digital Reg's JMOL motion because, allegedly, there is no substantial evidence of obviousness. Digital Reg also contends that the District Court did not properly exercise its discretion when it denied Digital Reg's new trial motion. Lastly, Digital Reg alleges the District Court abused its discretion by excluding the amount of the RPX agreement.

Digital Reg's positions lack merit, as explained below.[2]

## A.     The District Court Properly Denied Digital Reg's JMOL Motion

### 1.     The Standard Of Review

This Court reviews "JMOL decisions from the Northern District of California under the Ninth Circuit's de novo standard." *mFormation Technologies v. Research in Motion Ltd.*, 764 F.3d 1392, 1396 (Fed. Cir. 2014). Under that standard, this Court reviews a "jury's conclusions on obviousness, a question of law, without deference, and the underlying findings of fact, whether explicit or

---

[2] Although Claims 1, 2, 4 and 13 were invalidated, Digital Reg does not include arguments unique to the dependent claims, instead focusing on independent Claim 1. Thus, this appeal rises and falls with this Court's analysis of Claim 1. *See Gardner v. TEC Sys. Inc.,* 725 F.2d 1338, 1350 (Fed.Cir.1984) (en banc) (holding that dependent claims fall with the independent claim on which they depend unless argued separately).

implicit within the verdict, for substantial evidence." *LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.,* 275 F.3d 1347, 1353 (Fed. Cir. 2001).

When "a jury has found a claim to be obvious, this court presumes the jury resolved all factual disputes in favor of the verdict." *Pregis Corp. v. Kappos*, 700 F.3d 1348, 1354 (Fed. Cir. 2012). "What a reference teaches and whether a person of ordinary skill in the art would have been motivated to combine the teachings of separate references are questions of fact." *Id.* Secondary considerations are also part of the "factual inquiry" within the province of the jury's fact finding. *Id.*

All fact issues are presumed to be found completely in Adobe's favor and evaluated for substantial evidence. *Pregis,* 700 F.3d at 1354. The question is "whether a jury, viewing the evidence in the light most favorable to [the prevailing party], could have properly reached the conclusion reached by the jury." *Id.*

### 2.    There Is Substantial Evidence To Support The Jury's Obviousness Verdict

The evidence of obviousness presented at trial is overwhelming and easily supports and explains the invalidity verdict of the very attentive jury that included nine unanimous jurors.

Professor Schull explained to the jury, without challenge, how his prior art patented Softlock system worked. It regulates access to digital content just like the

38

'541 Patent.    A12115:1-12116:16.    It checks whether a client already has permission to access a particular item of digital content such as a document just as the claims require.    A12109:10-12111:16.    If not, it asks a server to grant permission such as by offering payment.    A12111:21-12112:18.    If permission for access is granted because, for example payment is successfully received, the client receives an encrypted seed, called a password.    A12112:8-12114:18.    The client decrypts the password so the seed can be used immediately or in the future to access selected content.    A12117:23-12118:6.    The password is locked to the particular client so other users cannot gain free access to the digital content.

Professor Wicker established how Softlock rendered the asserted claims obvious.    A12158:9-12160:2**.**    He systematically compared the disclosure of the Softlock Patent to the requirements of the asserted claims with very specific column and line and figure references.    A12146:5-12163:14.    He demonstrated that the systems are very similar and accomplish the same purpose.

Professor Wicker responded directly to Digital Reg's primary argument that the asserted claims are different from Softlock because the Softlock server itself generates a permission (aka, password) that is sent to the client whereas the claims of the '541 Patent generate the permission at the ***client*** based on a yes/no approval received from the server.    As addressed more fully below at section A.3(a) in his

response to Digital Reg's specific appeal arguments, Professor Wicker explained repeatedly that locating the permission-generating function at the client by simply sending an authorization to the client to do so is an obvious and straightforward way to reduce complexity at the server. He described that it is especially obvious to do this because it is well within the basic competency of a person skilled in the art and there was a desire in the prior art to reduce complexity at the server and move functionality to the client. A12152:21-24; A12156:17-25; A12158:14-12160:2, 12207:19-12208:5.

It is so obvious to place the permission-generating function at a client rather than a server (as Professor Wicker described to the jury) that Digital Reg failed to present any witness to contest this fundamental point. Digital Reg presented Professor Keller as its validity expert solely to attempt to respond to Professor Wicker's invalidity opinion. If anyone was supposed to support the arguments Digital Reg now makes on appeal, it was Professor Keller. But, although Professor Keller identified what he thought the differences were between the claims of the '541 Patent and Softlock, he never meaningfully challenged Professor Wicker's obviousness opinions.

Professor Keller never attempted to deny Professor Wicker's testimony that one skilled in the art would be motivated to have the client generate a permission

to minimize complexity at the server by off-loading that work. He did not deny that using a yes/no authorization was a straightforward way to accomplish this result that was well-within the basic competency of one skilled in the art. He did not deny that there was an established desire in this particular art to reduce complexity at the server by moving functionality to the client.

The total failure of Professor Keller to provide meaningful testimony on the issues Digital Reg raises on appeal is best illustrated by Digital Reg's omission of Professor Keller from its appeal brief. Digital Reg mentions Professor Keller once in a footnote in its statement of the case and *never* relies on him for its appeal arguments.

Given this lopsided trial record, the jury verdict that the claims were obvious was unsurprising – and well-supported. Equally well-supported is the District Court's denial of Digital Reg's JMOL based on its finding that Professor Wicker's obviousness opinion was substantial and largely "unrebutted." A114-116. Digital Reg has never explained why, if it disagreed with Professor Wicker's obviousness analysis at trial, it did not have its validity expert challenge the points that it now attempts to debate on appeal without the support of competent evidence.

### 3. Digital Reg's Arguments Regarding The Alleged Lack Of A Motivation To Combine Are Meritless

Digital Reg argues that there is insufficient evidence in the record of a

41

motivation to design a system like Softlock but with the permission generation at the ***client*** as claimed in the '541 Patent.  Indeed, the predicate of Digital Reg's appeal is that supposedly "Adobe presented no evidence or presented only conclusory expert testimony with no factual underpinnings that a skilled artisan would have been motivated to modify the record prior art to arrive at each of the missing limitations." AOB at 4.  Indeed, other than its narrow abuse-of-discretion argument about the RPX agreement, Digital Reg's appeal is devoted solely to challenging the sufficiency of the evidence of a motivation to design the claimed system.  AOB at 35-54.

Digital Reg's argument is flawed from the start because it relies upon law that is inconsistent with the obviousness instruction to which it agreed at trial. *Hewlett-Packard Co. v. Mustek Systems, Inc.*, 340 F.3d 1314, 1321 (Fed. Cir. 2003) (a "verdict must be tested by the charge actually given [under] the ordinary meaning of the language of the jury instruction").  Although Digital Reg attempts to rely upon a phalanx of cases to suggest that there is a rigid requirement that a motivation to combine must be proven in particular ways (AOB at 40-41), and to otherwise attempt to raise the legal bar to a finding of obviousness, by agreement the jury was instructed that motivation to combine was one of many considerations the jury could flexibly consider, stating in part:

42

You may consider whether Adobe has identified a reason that would have prompted a person of ordinary skill in the field to combine the elements or concepts from the prior art in the same way as in the claimed invention. There is no single way to define the line between true inventiveness on the one hand, which is patentable, and the application of common sense and ordinary skill to solve a problem on the other hand which is not patentable.

A12416:16-24.

Digital Reg's appeal is defective insofar as it attempts to rely upon legal rules that are different from the actual jury charge – which it failed to even mention, much less apply, in its appeal brief.

Digital Reg's appeal is also off-base because it neglects the import of *KSR Intern. Co. v. Teleflex Inc.,* 127 S.Ct. 1727 (2007). That decision rejected exactly the rigid approach to obviousness now promoted by Digital Reg on appeal.

Although Digital Reg at moments pays lip-service to *KSR*, it attempts to avoid its consequences. Digital Reg repeatedly criticizes Professor Wicker's analysis contending he does not identify detailed prior art teachings directed to the very subject matter of the claims. AOB at 36 ("There exists no explicit teaching in the sole prior art reference presented by Adobe—Schull—that a skilled artisan would be motivated to modify the prior art to arrive at each of the four missing limitations."); 38 ("Dr. Wicker offered a single-sentence conclusory opinion that the token-authorization limitation was obvious, and never explained his rationale

43

nor cited to prior art or any other evidence."); 42-43 (emphasis in original) ("As such, Dr. Wicker's generic testimony about a skilled artisan's alleged motive at some ***unspecified time*** to push ***unidentified functionally*** [sic] to the client cannot constitute clear and convincing evidence of a motive to modify the prior art . . ."). Yet, in *KSR* the Supreme Court explained that the "analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR,* 127 S.Ct. at 1741.

Digital Reg also criticizes Professor Wicker's analysis because he supposedly does not identify enough published patents or publications to prove that persons skilled in the art would be motivated to, and would know how to, place the permission-generation at the client as set forth in the claim. AOB at 44 ("Adobe did not present any prior art reference identifying the limitations missing from Schull to the jury. Adobe did not present any prior art reference identifying the nature of the problem to be solved or suggesting the inventions of the Asserted Claims as possible solutions."). Yet, in *KSR*, the Supreme Court criticized an "overemphasis on the importance of published articles and the explicit content of issued patents." *KSR,* 127 S.Ct. at 1741. As this Court has recognized, the fact finder must consider "common knowledge" and "common sense." *DyStar*

44

*Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.,* 464 F.3d 1356, 1367 (Fed. Cir. 2006) ("Our suggestion test is in actuality quite flexible and not only permits, but requires, consideration of common knowledge and common sense").

A more balanced statement of contemporary obviousness law recognizes that a proper analysis "may include recourse to logic, judgment, and common sense available to the person of ordinary skill that do not necessarily require explication in any reference or expert opinion." *Perfect Web Techs., Inc. v. InfoUSA, Inc.,* 587 F.3d 1324, 1328-29 (Fed. Cir. 2009). And the analysis does not require a "specific hint or suggestion in a particular reference" to prove obviousness. *Id.* But there is an end-point to this principle. As recognized in *KSR,* and restated by the cases cited by Digital Reg, an obviousness analysis must have "some articulated reasoning with some rational underpinning" to withstand legal scrutiny. *KSR*, 127 S.Ct. at 1741.

Digital Reg's position thus reduces to the meritless assertion that Professor Wicker's obviousness analysis based on Softlock lacked "some articulated reasoning with some rational underpinning" such that the jury verdict should be overturned for lack of substantial evidence. As the following sections demonstrate, Professor Wicker articulated his reasoning with rational underpinnings and the jury

was entitled to rely upon his unchallenged testimony as set forth in the unchallenged jury instruction they received.

> ### a. It Was Obvious To One Of Ordinary Skill In The Art To Generate A Permission At The Client Based On A Yes/No Indication From The Server

Digital Reg's primary argument is that one skilled in the art would not be motivated to generate a permission at the client based on a yes/no indication from the server. That is what the claims as construed require and what Digital Reg indirectly suggests is non-obvious.[3]

Professor Wicker explained that locating the permission-generating feature at the client was within the basic competency of a person of skill in the art who would be motivated to include this feature at the client to reduce the complexity at the server. The foundation of this testimony was his unquestioned expertise, Professor Schull's testimony, and the Softlock documentation.

The following excerpts from Professor Wicker's examination demonstrate that the evidence of obviousness on this point was substantial. Professor Wicker relied on Professor Schull's testimony (A12118:4-16) to support his opinion that the permission generation function can be included at the client:

---

[3] The District Court's construction of a "token" requires a file indicating whether the transaction has been approved that contains a yes/no indication. A34:17-23.

46

I think it would have been obvious to create a yes/no indication, and then send it to the client and have the password generated at the client. In fact, you heard Dr. Schull say that just a few moments ago. There are things that are done at the server in his invention that can be done at the client.

A12152:22-12153:2.

Professor Wicker explained that a person of skill in the art would be motivated to place the permission generation function at the client to off-load work from the server:

> Q.    You mentioned a couple of times with respect to the receiving the token limitation and the based on limitation that it would have been obvious. If you can walk us through in just a little bit more detail the analysis that you did for that particular conclusion.
>
> A.    Okay. With regard to obviousness, I noted that, first off, Schull does the generation at the server. So, the secret, as he called it, the seed, is encrypted at the server and sent to the client. Okay?
>
> So it's like Adobe. It is done at the server. But the claims require that it be done at the client. So I had to ask myself: "Would a person of skill with his or her ability, knowledge in reading the Schull Patent have thought it was obvious to do it at the client?" Well, I note that Dr. Schull actually talked about doing things at the client. And it would have been obvious to transmit that yes/no and let the client do the work instead of the server.

A12158:9-12159:2.

Professor Wicker also explained specifically that the Softlock Patent teaches the use of a password generator at the client as part of its machine locking feature

47

that could be used to generate the permission at the client without any loss of performance:

> Q.  So now let's talk a little bit more about your conclusion with respect to obviousness. And if you could point us in the Schull reference to what you were just describing.

> A.  Okay. So this is from column 8 of the '070 Patent, Professor Schull's patent. And line 66 through column 9, line four, what he states here is that in that case, the method by which the programmer's program determines the validity of the password is use the same method to generate the password in the user's processor. Okay?

> So you can generate a copy of the password locally during the check. So he says this is something someone might consider. It is a design choice and would have no effect on performance, essentially.

A1215914-12160:2.

Professor Wicker highlighted that persons of ordinary skill in the art would have known that complexity at servers was a problem, that it could be reduced by moving functionality to the client and that doing so was well-within their ability:

> Q.  With respect to the '541 Patent, there was some discussion with Mr. DiNovo as to whether or not it would be obvious to move the generation of the permission from the server. As it's done in the Adobe products or in the Schull Patent, to the client, as is required by the Court's claim construction. Can you explain why persons of ordinary skill in the art would want to do that? Why that would be within the knowledge and level of a person of ordinary skill in the art?

> A.  Okay. First I would like to note that it is something that is

48

> discussed in the references.
>
> Secondly, there are reasons why you might want to offload some complexity from the server. Especially in earlier years, complexity was an issue at servers. And the more complicated the server, the more likely you would have problems.
>
> So there has definitely been an effort over time to try to push out some of that functionality. Now, a person of skill in the art – and, again, in my opinion a person with an electrical engineering or computer science degree and two years of work experience, they would have known how to use the software functionality that was in the server to duplicate that functionality at a client. It is something that would have been well within their abilities.

A12207:9-12208:5.

The District Court recognized that this testimony, and more, constituted substantial evidence supporting the verdict. A113-116. Digital Reg's attempt to take on this evidence amounts to factual quibbles based on attorney argument that even its own expert failed to support.

First, Digital Reg argues that Professor Wicker's testimony is conclusory when explaining that a person of ordinary skill in the art would have been motivated to employ a yes/no authorization to allow the permission generating function to reside at the client. AOB at 37-39. This argument ignores the substance and context of Professor Wicker's testimony. He explained why a person skilled in the art would want to locate the permission generating feature at

the client rather than the server to reduce complexity at the server and spread the work. If that is done, the server obviously has to inform the client that it is authorized to generate the permission otherwise the system would not fulfill its purpose of regulating access to digital content after a client requests access from a licensing server.

It is undisputed that the basic technique of sending a yes/no authorization from a server to a client is within the skill of the art – even Digital Reg's expert does not deny this. And the motivation for using this basic technique is the desire to move the permission generating function from the server to the client to reduce server complexity and work load. See, e.g. A12158:25-12159:2 ("And it would have been obvious to transmit that yes/no and let the client do the work instead of the server."). This technique is nothing more than a predictable use of prior art elements according to their established functions. *See KSR*, 127 S.Ct. at 1740 ("a court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions").

Digital Reg's argument that the identified motivation is conclusory, not articulated, or that it lacks a rational basis is meritless. It speaks volumes that Professor Keller did not deny that this motivation would have existed. The jury was entitled to conclude that such a motivation existed as a factual matter. *In re*

*Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000) ("The presence or absence of a motivation to combine references in an obviousness determination is a pure question of fact.").

Second, Digital Reg argues that the "could have" and "know how" testimony of Professor Wicker and Professor Schull is legally insufficient. AOB at 40 ("The relevant question is whether a skilled artisan *would* have been motivated to make the modification, not whether the artisan *could* make the modification."), 41 (". . . whether one 'could have' or would have known 'how to' put elements together is *not* the test for obviousness.") (emphasis in original). Digital Reg argues that this testimony merely establishes that one skilled in the art would know how to design the claimed invention with permission generation at the client, but not that they would be motivated to do so. *Id.* at 42 ("Likewise, Dr. Wicker's testimony does not constitute clear and convincing evidence of a motivation to modify the prior art 'in the way the claimed new invention does.'").

This argument misses the point. That the techniques used to place permission-generation at the client were undisputedly within the basic skill of an ordinary worker in the field certainly supports that such a design is obvious and based on predictable technology. But the evidence did not stop there. Professor Wicker was explicit that a person skilled in the art would be motivated to locate the

51

permission generation at the client to reduce complexity at the server with the comfort that it would not reduce performance. This is articulated reasoning with a rational underpinning. It is also substantial evidence of a motivation that the jury was entitled to accept, especially because Digital Reg's witnesses did not deny it.

Third, Digital Reg argues that Professor Wicker did not specify when the motivation to move functionality to the client existed and what functionality was part of that motivation. AOB at 41-43. These are weak factual quibbles. Professor Wicker explained that "[e]specially in earlier years, complexity was an issue at servers." A12207:20-21. This is speaking about the motivation at the relevant time and there is no reason to doubt that. The emphasis on *earlier* years establishes that the motivation predated the filing date of the patent and the jury was entitled to conclude that, especially in the absence of any challenge by Digital Reg on this point at trial.

Digital Reg's argument that Professor Wicker did not identify a precise motivation that is specifically tied to a particular software function is legally foul. There is no obligation to identify a "specific hint or suggestion in a particular reference" to prove obviousness. *Perfect Web Techs., Inc. v. InfoUSA, Inc.,* 587 F.3d 1324, 1328-29 (Fed. Cir. 2009). And such a rule would conflict with the agreed-upon jury charge. A12416:16-20 ("You may consider whether Adobe has

52

identified a reason that would have prompted a person of ordinary skill in the field to combine the elements or concepts from the prior art in the same way as in the claimed invention."). The general prior art pressure to move functionality from the server to the client in these systems is more than a sufficient basis for the jury to have found a motivation, especially because it could do so using well-established techniques that would not diminish performance.

Fourth, Digital Reg argues that the only evidence of motivation "taught away" from having the client generate the permission. AOB at 44-47. Digital Reg's witnesses did not support this "teaching away" argument and it should be rejected on that basis alone. Nonetheless, Digital Reg contends that the Softlock Patent is inconsistent with placing the permission-generating function at the client due to security concerns. *Id.*

The District Court flatly rejected this argument and this Court should too. A116:8-15. In Softlock, to lock the software to the client, the client generates the permission at the client as a check to match with the permission received from the server. A10591(8:66)-10592(9:4), 12159:14-12160:2. Accordingly, Softlock already has a permission-generating feature in the client. A12159:24-25. Softlock does acknowledge a potential security concern with this feature, but it describes it as an "acceptable, but undesirable" feature. A10592(9:5-10). Digital Reg

deceptively cropped out the key part of the sentence that recognizes that placing the permission-generating function at the client is identified by Schull as *acceptable* notwithstanding the security concern. AOB at 47. Indeed, Schull *claims* this "acceptable, but undesirable" feature of generating the permission at the client as part of his invention in his patent, which is hardly teaching away. A10598(21:58-65). This may be why Digital Reg never made this argument to the jury. Finally, Schull describes multiple ways that you can avoid a security concern if one really cared about it. A10592 (9:5-56).

Fifth, Digital Reg criticizes Professor Wicker's testimony that the location of the permission-generating function is a "design choice." AOB at 47-51. Digital Reg indiscriminately argues that it is not a design choice, even if it was a design choice it is insufficient, and there was no motivation to make the design choice. Professor Wicker amply supported his testimony that the location was a design choice because either alternative was known in the prior art and within the competency of one skilled in the art.

Digital Reg's point appears to be that a "design choice" is not obvious if the there is a difference in function. But none of its cases stands for this proposition. And Professor Wicker explained that the location of the permission-generating function would not be expected to change the performance and the technologies to

do so are all basic technologies within the competence of one skilled in the art. A12159:24-12160:2. Digital Reg's "design choice" argument fails in the face of all the evidence of obviousness catalogued in this brief.

> **b.    It Was Obvious To One Of Ordinary Skill In The Art To Employ A File To Transmit A Yes/No Indication From The Server**

Digital Reg contends that Softlock would not use a file to transmit the yes/no indication from the server to the client and the use of such a feature is inventive. AOB at 51-54. Digital Reg attempts to exploit wordplay. Professor Schull explained at trial that the password in Softlock was a string of numbers and when asked he acknowledged that the string was not a file. A12135:4-21. A file is a container and the string is the content in the container. Digital Reg attempted to make something of this by confusing the password (a string of numbers) with its container (a file) and suggesting that Professor Schull had acknowledged that his system had no file when he testified that the string was not a file. A12194:2-12195:4.

To respond to this cynical gambit, Professor Wicker was asked to explain to the jury that the format of the ***permission itself*** is not mandated by the claim so that Professor Schull's testimony could not be misused. A12210:11-24 ("There is nothing in the claim language that says ***your password*** has to have a certain

form...").

Digital Reg doubles down on appeal. It now argues that by explaining that the form of the permission is not limited, Professor Wicker somehow ignored the "file" requirement of the District Court's construction of "token." AOB at 52.

Not only is this a misuse of his testimony described above, but it ignores Professor Wicker's testimony regarding the "file" requirement. Professor Wicker explained that a file is necessary because such a structure is a required aspect of any system where the token is sent over the internet. A12194:15-20 ("Q. Okay. And that is not a file, is it? A. Well, it depends on the context. In other words, if I'm transmitting it through the internet it will be a file in the sense it is something that has been embedded in the datagram, and something that has to be manipulatable by the various layers of the receiver."). Thus, not only did Professor Wicker acknowledge that a file is required, he explained that it was necessarily present and that those skilled in the art would know that it is present as a matter of basic Internet communication.

Digital Reg failed to present any testimony that the use of a file to transmit a yes/no authorization over the Internet could somehow constitute inventive activity. Digital Reg's argument that the use of a "file" is inventive is completely

unsupported and defies common sense.[4]

### 4.    Digital Reg's Secondary Consideration Argument Is Meritless

Digital Reg contends that the secondary considerations in this case require judgment to be entered in its favor notwithstanding the verdict.  AOB at 54-56.

This argument is very narrow.  Digital Reg does not assert that evidence of commercial success, long-felt need, failure of others, industry praise, copying, or unexpected results support its position.  It did not offer evidence to try to prove any of these secondary considerations.

Digital Reg merely argues that it was deprived of informing the jury of the dollar value of an agreement it entered into with RPX and this would supposedly have been material.   Digital Reg did not include anything about secondary considerations in its pre-verdict JMOL and this argument is thus waived.  *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 845 (Fed. Cir. 2010); A12713:22-12714:2.

---

[4] Digital Reg summarily argues that Adobe failed to prove it would have been obvious to generate a permission "based on" the token.  AOB at 51, 53.  Digital Reg does not develop this argument at all and it should be deemed waived.  In any event, as Professor Wicker explained, it was obvious to use a yes/no authorization (the heart of the token) to trigger the generation of the permission at the client. A12158:14-12159:2.  It is unclear how this could be deemed inventive and Digital Reg's witnesses do not contend it was.  This half-hearted argument should be rejected.

Even if it is nonetheless considered on appeal, this argument should be rejected because it is not a proper JMOL. There is no plausible argument that this evidence would somehow *require* entry of judgment in Digital Reg's favor without the need for a jury trial.

On the merits, Digital Reg's argument is unpersuasive. To reverse the District Court's exclusion of the precise dollar amount of the RPX agreement Digital Reg must prove that it is an abuse of discretion and prejudicial. *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1260 (Fed. Cir. 2004) ("This court will reverse the district court's denial of a new trial motion based on evidentiary rulings only if Chiron establishes both that the rulings were an abuse of discretion and that it suffered substantial prejudice.").

The District Court acted well-within its discretion in its balanced limine ruling by allowing in the RPX license, allowing it to be described as higher than the other licenses, but not allowing into evidence the actual amount of the agreement. A87:14-19. In opposition to Adobe's limine motion, Digital Reg only argued that the RPX license was relevant to *damages*. A9476 ("The Court Should Deny Adobe's MIL No. 2 Because The RPX License Is Relevant to an Appropriate Reasonable Royalty").

But Digital Reg's own patent valuation expert, Randall Parr, testified in

deposition that the RPX agreement was ***not*** a reliable proof of a reasonable royalty. A9251(184:21)-9252(188:19). As he noted, RPX's business model is complex and it is not clear how the payment related to RPX's revenue or the patent. *Id.* For that reason, he testified that he "did not feel it was appropriate to rely on the RPX license for the hypothetical negotiation analysis" even though it would have inflated his royalty numbers. A9252(187:15-21). Indeed, Mr. Parr testified that, if given the opportunity, he would tell the jury "I don't think it [the RPX agreement] is useful for this case." A9252(188:12-19).

At the pretrial conference, Digital Reg argued that the RPX amount was relevant to damages because it should be considered to respond to Adobe's argument that Mr. Parr had deemed very small settlements incomparable and excluded them from his analysis improperly. Specifically, Digital Reg argued that the amount of the RPX agreement should be shown to the jury to explain that Mr. Parr excluded not only low value licenses, but this higher value license that was non-comparable. A9874:24-9875:19. In doing so, it admitted that Mr. Parr "didn't view it [the RPX agreement] as comparable that would help the jury." A9875:9-15 (Digital Reg's counsel: "There's a number of complexities associated with RPX.").

In the end, allowing Digital Reg to identify the RPX agreement as higher than the others, but refusing to allow the RPX amount into evidence made perfect

sense given Adobe's legitimate concern that the multi-million dollar amount would skew the damages horizon. A9204:18-9205:4*; see Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011) ("$19 billion dollars in revenue from an infringing product cannot help but skew the damages horizon for the jury"). In opposing the motion in limine in its brief and at the pretrial conference, Digital Reg never mentioned obviousness as a theory of relevance that could justify the introduction of the RPX dollar amount.

Notwithstanding this ruling, Digital Reg argued to the jury in its opening statement regarding damages that the RPX agreement was a "very large license agreement," "the big one," and "the high number." A10968:2-12. The District Court found this to be a violation of the limine, but did not take curative steps. A11079:20-23 ("I thought you [Digital Reg], in the opening, violated the motion *in limine*"). And in the wake of the District Court's statement that this was a violation, Digital Reg's principal, Mike Farley, bragged in his testimony that the RPX agreement was "much, much higher" in value than its other licenses. A11182:1-4.

Although Digital Reg now contends that the RPX agreement is significant to its obviousness case, it only introduced obviousness as a theory of relevance that could justify introduction of the amount of the RPX agreement at 9:00 am on the

last day of trial, as the bottom argument of many in a written "offer of proof." A1419. Digital Reg also points to a colloquy during trial regarding this issue. Although Digital Reg did mention that licensing was a secondary consideration, its argument pertained to two other settlements (EA and Symantec), not RPX. A11075:16-76:10. Digital Reg's argument regarding RPX was described as the "other" argument and it was that Adobe had opened the door and thus the limine should no longer apply. A11078:14-79:19. The District Court responded that in fact it was Digital Reg that had violated the limine. A11079:20-23. Digital Reg did not argue to the Court that the RPX amount was relevant to obviousness, even though both those subjects came up, but for separate points. A11076-79.

Digital's tardy written offer of proof does not explain how the particular dollar amount of the RPX agreement creates a nexus to the non-obviousness of the invention. A12572. The probative value of the RPX license is dubious given that so many other licensees paid only nuisance value and Digital Reg's own witnesses testified it was hard to know what the RPX agreement was about. A10845. Despite its dubious probative value, Digital Reg offered no evidence that the RPX agreement is probative of the validity of the patent such as by explaining who obtained RPX sub-licenses and why. *In re GPAC Inc.,* 57 F.3d 1573 (Fed.Cir.1995) ("Licenses taken under the patent in suit may constitute evidence of

61

nonobviousness; however, only little weight can be attributed to such evidence if the patentee does not demonstrate 'a nexus between the merits of the invention and the licenses of record.'").

In contrast, Professor Wicker thoroughly addressed a long list of secondary considerations and explained why none of them supports Digital Reg.  A12186:16-12190:8.  Digital Reg did not cross-examine Professor Wicker regarding RPX or any other agreement.   A12190:17-12207:5, 12216:17-12220:22.   Digital Reg's validity expert did not touch the topic of secondary considerations.   A12223:7-12258:19; 12283:9-12288:6.

Digital Reg's attack on the District Court's limine ruling ignores that it did not make the argument it presents on appeal until the end of trial and even then buried in a document entitled "offer of proof."  A14219; A12569-12572.  That was far too little far too late.  It had failed to make this argument before the Court issued its *limine* ruling even though the topic had been the subject of much argument.  A9870:22-9876:8; A11075:16-11080:12.

Even when Digital Reg mentioned the RPX agreement in opening, in closing, and in witness testimony – including its statement that it was a "very large license agreement" – it raised that subject on the topic of damages and never presented it on obviousness.  As the District Court held, Digital Reg exposed the

jury to its position that the RPX agreement was for a very large dollar amount such that the exclusion of the exact amount of the RPX agreement could not have been material.  A117:11-118:4.

Ultimately, Digital Reg's inflated claims of relevance now are inconsistent with its trial conduct and much too late.  And the confusion and unfair prejudice of the introduction of the RPX dollar value on the damages issue is manifest given Mr. Parr's testimony that this RPX was irrelevant to a proper royalty for this case.  There was no abuse of discretion.

The exclusion of the precise amount of the RPX agreement does not in any way warrant the entry of judgment of no invalidity in Digital Reg's favor.  The cases cited by Digital Reg are so remote from the facts of this case that they shed no light.  There were no valid secondary considerations evidence excluded from this case and they are insufficient to overwhelm the lopsided obviousness evidence in any event.

***

For all the above reasons, Digital Reg's challenge to the District Court's JMOL ruling should be rejected.

## B.    The District Court Properly Denied Digital Reg's New Trial Motion

The denial of a new trial motion is reviewed under the deferential abuse of

discretion standard. *Hewlett-Packard Co. v. Mustek Sys., Inc.,* 340 F.3d 1314, 1318 (Fed. Cir. 2003). Digital Reg does not add any arguments in support of its appeal of the District Court's denial of its new trial motion. For all the reasons that this Court should affirm the District Court's denial of Digital Reg's JMOL motion it should deny its new trial motion too.

### C.    The District Court's Ruling Regarding The RPX Agreement Was Not An Abuse Of Discretion

Digital Reg contends that the District Court abused its discretion by excluding the amount of the RPX agreement and seeks a new trial. This is the same argument it makes in support of its challenge to the District Court's denial of its JMOL and new trial motions and should be rejected for those same reasons.

## CROSS-APPEAL ARGUMENT

## THE DISTRICT COURT'S EXCEPTIONAL CASE RULING SHOULD HAVE BEEN BROADER

### A.    The Standard Of Review

Although the District Court declared this an "exceptional case" under § 285 and awarded Adobe attorney fees for two major episodes of Digital Reg's litigation misconduct, it declined to include Digital Reg's misconduct in its damages case in that decision. The denial of an "exceptional" case motion is reviewed for "abuse of discretion." *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.,* ___ U.S. ___ 134 S.Ct. 1744, 1749 (2014). But, as the Supreme Court recently explained in

*Highmark*, the "abuse-of-discretion standard does not preclude an appellate court's correction of a district court's legal or factual error:   'A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'"   *Id.* at n.2 (*quoting Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990)).

### B.    The District Court Erred By Overlooking Digital Reg's Litigation Misconduct In Its Damages Case

Digital Reg's litigation of its damages case was outrageous, highly prejudicial and by any reasonable measure egregious.   The District Court's willingness to overlook this behavior should be reversed, as a clearly erroneous finding of fact and the legally erroneous failure to consider the totality of the circumstances.

The District Court's decision is erroneous because it does not address:   (1) its own severe criticism of Digital Reg's original damages report – and indeed conflicts with it, (2) Digital Reg's unauthorized submission of a supposed curative report that was substantively improper, (3) that the damages theory in Digital Reg's replacement report arrived at the same royalty rate as its other theories despite using a different methodology, (4) the highly prejudicial impact of Digital Reg's misconduct, and (5) that this misbehavior was part of a proven pattern of

egregious misconduct.

### 1. Digital Reg's Original Damages Report Was Egregious

Digital Reg submitted an implausible expert report from Mr. Parr. A9266-9280. Yet, Digital Reg described Mr. Parr as the expert who "literally wrote the book on the subject [of reasonable royalties]." A10967:4-5.

Consistent with the District Court's practice, Adobe challenged that report after expert discovery in its motion *in limine* to be heard at the pretrial conference. On the eve of trial, the District Court severely criticized the report and struck it entirely on multiple independent grounds. The District Court's finding that the problems with the report were not egregious enough to warrant inclusion in its "exceptional case" determination cannot be squared with its own findings in its *Daubert* opinion – or the record.

This is the substance of the opinion. Digital Reg's report concludes that its patents reduced the piracy of Adobe's products such that it deserves to share the profits from the reduced piracy. It then assumes that it would get half of Adobe's profits from such savings. It does this based on the entire market value of the Adobe products without attempting to prove that the patents drive product demand. Finally, it performs a check where it reduced the portion of product revenue to which it applied its royalty rate, but it mechanically increases the royalty rate to

ensure that the reduction in revenue does not change the ultimate damages number.

First, the District Court found Digital Reg's piracy-savings approach to be "inherently unreliable." A79:12-14. Even that is too polite. Digital Reg started by taking general software industry rates of around 20% for 2006-10. A9277 ¶ 174. It assumes that those rates reflected piracy without use of the patented technology. *Id.* It relied upon a deposition comment from a Symantec witness that its piracy rate was 6-10%. *Id.* It assumes that this Symantec rate reflected a piracy reduction from use of the patented technology of 10-14% relative to the 20% general industry rate. *Id.* It assumes Adobe experienced this same piracy savings for all four of the accused products. *Id.*, A9235(81:25)-9236(84:19).

This theory does not pass the straight face test, especially from an expert who "literally wrote the book on the subject" according to Digital Reg. It assumes that there is no use of the patented technology before 2010. Yet the patents issued long before then, Digital Reg accused all the defendants of infringement dating back *before* 2010, and Digital Reg licensed its technology to numerous major software companies, including Microsoft and Apple *before* 2010 for their large volume of sales. A9270-9272 ¶¶ 131-136 (listing licenses from before 2010), A9274 ¶ 143 (listing patent filing dates), A9276 ¶ 156 (identifying revenue back to 2005). It assumes that Symantec's 6-10% piracy rate is accomplished via the

patented technology without any proof that Symantec is using the patented technology, without showing that Symantec ever experienced the higher 20% "general" piracy rate, and without a showing of when Symantec experienced the estimated 6-10% piracy rate relative to the supposed adoption of the patented technology. It nevertheless concludes the patents resulted in a 10-14% piracy saving for Symantec. A9239(104:17-105:23), A9277 ¶ 174. It assumes that all of this supposed piracy saving is attributable to the patent without evidence. Finally, it assumes without any basis that Adobe experienced this same supposed piracy savings as Symantec without any evidence about Adobe and without any showing why Symantec among the many software companies would be an acceptable proxy for Adobe, even if proof by proxy were acceptable.

Second, the report assumes that Digital Reg would split 50-50% Adobe's profits from the 10-14% of product sales that the patents supposedly saved from piracy. The District Court correctly lambasted this opinion as "even more arbitrary than the [25%] rule rejected in *Uniloc*." A81:13-16. This profit split was based merely on Mr. Parr's vague assertion that he was generally aware of some negotiations where parties decided to split profits. A81:3-4 (District Court: "Mr. Parr decided to adopt a fifty-percent starting point based on his vague, undisclosed general experience."). He did nothing to tie his profit split assumption to the facts

of this case.  A81:10-13.  In the wake of *Uniloc*, it is egregious to apply a 50% profit share that has not only no basis in the facts of the case, but has no support from citation to any authority.

Third, Digital Reg defiantly ignored the entire market value rule, as though it did not exist.  It used the entire revenue of Adobe's products without even attempting to show that the patented technology related to demand, much less drove demand.  A84:6-9, A9275 ¶ 152("The patented invention is not a product that consumers seek-out and are only aware of when they wish to begin using the products they have purchased.").  The District Court documented that this approach unjustifiably ignored well-established law including *Uniloc* and *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir. 2012). A82:20-84:9.

Fourth, Digital Reg's report included a so-called check.  It assumed that the patent would only apply to 30% of Adobe's revenue, but upped the royalty rate to compensate for the reduced base to ensure that the exact same result was obtained. A84, A9518 ¶ 188.  Digital Reg's expert had no shame that he engaged in such a superficial and legally inappropriate exercise.  He admitted to it readily. A9259(215:11-16) ("Q. Okay. Then once you arrived at that amount, you determined that if somebody were to tell you that you had to use the smallest

salable unit, you would decrease the base but increase the rate to get to the same number? A. Yes."); 214:15-23; A9258(212:20-24); A9258(213:10-18) ("[Q.] And the question that I have is: The way that you've done that analysis, because you're adjusting the royalty base and then adjusting the royalty rate in a proportionate way, under your math, any time you reduce the royalty base by a particular amount to arrive at a smallest salable unit, you would have a corresponding increase in the royalty rate to arrive at the same dollar amount. Right? A. That's what I did here.").

The District Court point blank concluded that Digital Reg's "analysis contravenes Federal Circuit precedent" in this additional way. A84 (quoting *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1338 (Fed. Cir. 2009) as follows: "Being precluded from using the computer as the royalty base, he used the price of the software, but inflated the royalty rate accordingly. This cannot be an acceptable way to conduct the reasonable royalty analysis.").

In short, Digital Reg's unvarnished and repeated disregard for Federal Circuit precedent – as documented by the District Court – was reckless at best and can only be seen as egregious misconduct.

### 2. Digital Reg's Second Damages Expert Report Was Unauthorized and Improper

The District Court in its "exceptional" case decision did not address Digital

70

Reg's improper second report, which it had also precluded pretrial. That was error because the Court should have considered all the circumstances.

At the pretrial conference, the District Court expressed grave concern about how the trial would go forward if it struck Digital Reg's original damages report in whole. A9848:4-6 ("I'll have to take this under advisement, but I am very concerned with this witness, so I think you better start thinking about what you will do").

Digital Reg responded by submitting without permission a supplemental report that was supposed to cure problems such as its reliance on the presumed 50% profit split. A85:23-26, 14181:10-22. But the report suffered from the same problems and more. A14185-14190.

The Court precluded Digital Reg from relying on that report because it did not cure the problems with its original report and improperly relied on supposedly new evidence. A85:23-26 ("it should have sought leave from the Court diligently").

Digital Reg's second failed report required Adobe, less than a week before trial, to devote precious resources to react swiftly with a full analysis and argument as to why this report was also legally improper. That was successful, but costly. The equities dictate that Digital Reg should bear the attorneys' fees incurred as a

71

result.  The District Court should have considered this.

### 3.    Digital Reg's Third Report "Troubled" The District Court

Notwithstanding the prejudice to Adobe, the District Court allowed Digital Reg to serve a third report, just days before trial, with Adobe to take the deposition of Digital Reg's expert during trial.  And, given the history of defective opinions, it allowed Adobe to file another *Daubert* motion at trial.  A85:9-13.

As it turned out, that third report was replete will legal problems and arrived at essentially the same royalty rate as all the other theories, which had been rejected as unsound.  A14212-14214.  The District Court found this game-playing to be "troubling."  A14182:6-8 ("Mr. Parr's perpetual conclusion of the same 2.5% royalty rate, regardless of inputs or methodology is troubling."), A11878:11 ("I am very troubled by his testimony").

In view of the District Court's concerns about leaving Digital Reg without any damages theory or presiding over a mistrial, it did not strike this third report even though it was replete with error.  A14208-14214, A11220:8-13, A14180-14182.

The District Court in its "exceptional" case decision should have considered the "very troubling" nature of Digital Reg's third report and its legally infirm character.

### 4.    Digital Reg's Misconduct Was Highly Prejudicial To Adobe

Digital Reg's behavior was highly prejudicial to Adobe. But the District Court did not address this inequity.

To attempt to pressure Adobe to settle (as it had done with many others), Digital Reg was able to wield an inflated and legally improper royalty. Although Adobe was able to eliminate that damages theory, it required Adobe to devote very substantial resources on the eve of trial. This included the review of two attempted replacement reports and the submission of substantial challenges to those reports. It also required Adobe to prepare for and take a mid-trial deposition on a new damages report.

The distraction and expense caused by Digital Reg's misconduct is very substantial. It should have been considered by the District Court and coupled with all the evidence of misbehavior warrants a finding of exceptionality.

### 5.    Digital Reg's Pattern Of Misconduct Should Have Been Considered

The District Court found that Digital Reg engaged in two serious incidents of misconduct in connection with the trial. Digital Reg does not challenge those findings. This pattern of misconduct should have been considered by the District Court as part of the totality of the circumstances in determining whether Digital Reg's approach to its damages case also warranted the reimbursement of Adobe's

73

fees.

### C.  This Court Should Remand This Case For An Accounting Of Fees Attributable To Digital Reg's Submission Of An Implausible Damages Report

Considering the totality of the circumstances the District Court's "exceptional" case finding should have included Digital Reg's misconduct in its damages case. The behavior was unquestionably egregious and part of a pattern of misconduct, as documented above.

Shoot-for-the moon damages theories are all too common in contemporary patent litigation, especially where the goal is to pressure a case for settlement with the hope that the theory never sees the light of a *Daubert* order, much less a trial. The costs imposed by such an approach on the courts and the defendants are considerable. The court is placed in a Hobson's Choice where it either allows the defective theory to go forward with the hope that the verdict or post-trial motions can clean it up or the trial is disrupted with delay or the confusion of a new theory. The defendant not only has a fire-drill on its hands, but often has to worry that the plaintiff will be permitted to overhaul its damages' position at trial with greater visibility of the litigation landscape and less time for its adversary to develop an effective response.

Here, not only did Digital Reg tender a damages theory that violated

74

numerous legal rules and insulted common sense, but its reaction was to improperly tender another defective report without authority and then to present another report that used a different inputs, but arrived at the same royalty rate. That is exceptional and it should have been recognized as such. This case should be remanded for the District Court to calculate the appropriate fee award based on Digital Reg's misconduct in its damages case.

## CONCLUSION

The District Court invalidity judgment should be affirmed and its denial in part of Adobe's attorneys' fees motion should be vacated and remanded.

Dated: September 25, 2015              Respectfully submitted,

By:  /s/ *Edward R. Reines*
_____

Edward R. Reines
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
(650) 802-3000

*Counsel for Defendant-Cross-Appellant*
Adobe Systems, Inc.

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B).  This brief contains 16,111 words as calculated by the "Word Count" feature of Microsoft Word 2007, the word processing program used to create it.

The undersigned further certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).  This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Times New Roman 14 point font.


Dated:  September 25, 2015                */s/ Edward R. Reines*

Edward R. Reines
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
(650) 802-3000

*Counsel for Defendant-Cross-Appellant*
Adobe Systems, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this day, September 25, 2015, I served DIGITAL REG OF

TEXAS, LLC the foregoing **PRINCIPAL BRIEF OF ADOBE SYSTEMS, INC.**

via the Court's CM/ECF system and electronic mail.


Dated: September 25, 2015                          /s/ *Tammy Su*

                                                   Tammy Su
                                                   Paralegal
                                                   WEIL GOTSHAL & MANGES LLP
                                                   201 Redwood Shores Parkway
                                                   Redwood Shores, CA 94065
                                                   Telephone: (650) 802-3000